IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GARY M. HENDRIX,<br><br>    Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>    Defendant. | 8:11CV04<br><br>MEMORANDUM AND ORDER |

  This matter is before the Court on the Motion for Summary Judgment (filing 30) submitted by defendant Union Pacific Railroad Company ("U.P."). Plaintiff Gary M. Hendrix originally filed this case in Nebraska state court. Filing 1-1, at 3. Hendrix alleges that U.P. discriminated against him on the basis of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*. U.P. removed the case to this Court, invoking its federal question jurisdiction. Filing 1. The Court has considered the parties' briefs (filings 31, 35, and 39) and indexes of evidences (filings 32, 34, 36, and 40). For the reasons discussed below, the Court grants U.P.'s Motion for Summary Judgment.

**STANDARD OF REVIEW**

  Summary judgment is only proper when the Court, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in the nonmoving party's favor, *Watkins Inc. v. Chilkoot Distributing, Inc.*, 655 F.3d 802, 803 (8th Cir. 2011), determines that the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

  The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Id.* If the movant does so, the nonmovant must respond by submitting

evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

To raise a genuine issue of material fact, the nonmovant must do more than simply show that there is "'some metaphysical doubt'" as to the material facts. *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). To show that disputed facts are material, the nonmovant must cite to the relevant substantive law and identify facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). A mere existence of a scintilla of evidence in support of the nonmovant's position is not sufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## FACTUAL BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the pending motion for summary judgment.

**1.    Hendrix's Prior Experience with U.P.**

On or about January 11, 1999, U.P. hired Hendrix as a train dispatcher. Filing 32-1, Deposition of Gary M. Hendrix ("Hendrix Dep."), at 5–6. As a train dispatcher, Hendrix was responsible for ensuring the safety of trains moving through a specific region of U.P.'s rail lines. Filing 32-1, at 7. The position was "safety sensitive": if dispatchers do not perform their jobs correctly, railroad employees or members of the public could be killed or seriously injured. Filing 32-1, at 7–8. In 2002, Hendrix applied for a locomotive manager position and was hired. Filing 32-1, at 9–11. This was a "Band C" position, whereas the position of train dispatcher was in "Band B." Filing 32-1, at 9–11. This was considered a promotion, as a Band C position generally received more compensation and greater benefits than a Band B position. Filing 32-1, at 9–11. As a locomotive manager, Hendrix tracked the use of locomotives on U.P.'s railways. Filing 32-1, at 12–13.

In 2003, Hendrix's locomotive manager position was one of several eliminated due to economic conditions. Filing 32-1, at 14–15. Hendrix was offered the chance to return to his position as a train dispatcher, which he accepted. Filing 32-1, at 14–15. Even though Hendrix had previously worked as a train dispatcher, he was required to complete a new training class for the position. Filing 32-1, at 15–16. There was nothing unusual about this: the rules governing train dispatchers changed frequently and re-training was necessary for safety purposes. Filing 32-1, at 16–17. Hendrix successfully

completed the training and worked as a train dispatcher for about 1 1/2 years. Filing 32-1, at 17–18.

**2.      Hendrix Becomes Manager of the Horsepower Hours Desk**

Around July 2004, Hendrix again applied to be, and was hired as a locomotive manager. Filing 32-1, at 25. This time, Hendrix was responsible for running the "horsepower hours desk." Filing 32-1, at 26. On any given day, U.P. has approximately 300–400 "foreign" locomotives (locomotives owned by other railroads) operating on its own railways, and 300–400 of its own locomotives on foreign railways. Filing 32-2, Ex. A3, Declaration of Ed Benesh ("Benesh Decl."), at ¶ 4. U.P. and the other railroads must compensate one another for the use of each other's' locomotives. Filing 32-2, Benesh Decl., at ¶ 5. U.P. keeps track of this through "horsepower hours." Filing 32-2, Benesh Decl., at ¶ 6.

Hendrix's job was to track horsepower hours. Filing 32-2, Benesh Decl., at ¶ 8; filing 32-1, Filing 32-1, Hendrix Dep., at 27–28. At some point, Hendrix became the sole person responsible for tracking horsepower hours. Filing 32-1, Hendrix Dep., at 26; filing 32-2, Benesh Decl., at ¶¶ 2–11. Before Hendrix started his shift each day, a spreadsheet containing the current horsepower hours data was downloaded to his computer. Filing 32-1, Hendrix Dep., at 28–30; filing 32-2, Benesh Decl., at ¶ 9. This spreadsheet contained raw data generated by devices posted next to tracks throughout the railway system that automatically scanned codes on passing trains. Filing 32-1, Hendrix Dep., at 28–29. These data often contained errors. Filing 32-1, at 28–29. For example, a scanner might fail to pick up a train's code, or a train might not have the correct code attached. Filing 32-1, at 28–29. Hendrix spent most of his workday reviewing the spreadsheet for accuracy and correcting these errors. Filing 32-2, Benesh Decl., at ¶¶ 10–11. Hendrix created a report using the spreadsheet which was shared with other railroads and U.P. executives at the end of each day. Filing 32-2, Benesh Decl., at ¶¶ 10–11. Hendrix's position was part of the "Fuel Management Group," which was supervised by Ed Benesh. Filing 32-2, Benesh Decl., at ¶¶ 2–3.

Benesh was responsible for reviewing Hendrix's performance and conducted annual performance reviews. Filing 32-2, Benesh Decl., at ¶ 12. U.P.'s performance rating system ranged from 1.0 to 5.0, with 1.0 being the highest rating and 5.0 the lowest. Filing 32-2, Benesh Decl., at ¶ 13. Hendrix always received an "average" rating of "3.0-Good Performer." Filing 32-2, Benesh Decl., at ¶ 14; *see also* filing 32-2, Ex. A4, Hendrix Performance Evaluations for 2007 and 2008 ("Hendrix Evals."), at 7–14. Hendrix agreed that Benesh fairly evaluated his performance. Filing 32-1, Hendrix Dep., at 34–36.

**3.     The New Horsepower Hours System**

In 2007, U.P. conducted an audit of the horsepower hours system, which revealed errors in the data and how the data was processed. Filing 32-2, Benesh Decl., at ¶ 15. Partly as a result of this audit, Benesh was advised that U.P. wanted to create a new horsepower hour system that would replace the old spreadsheet-based system. Filing 32-2, Benesh Decl., at ¶ 16. U.P. hoped that the new system would reduce inaccuracies and give U.P. the ability to better manage the flow of locomotives between U.P. and foreign railroads. Filing 32-2, Benesh Decl., at ¶ 16.

Later in 2007, U.P. employee Roger Brandl became a locomotive manager in the Fuel Management Group and was tasked with developing and implementing the new horsepower hours system. Filing 32-2, Ex. A5, Declaration of Roger Brandl ("Brandl Decl."), at ¶¶ 6–8. Brandl has a B.S. in Industrial Engineering from the University of Nebraska. Filing 32-2, Brandl Decl., at ¶ 3. Before working with U.P., Brandl worked for a small company where he used software to analyze and make performance improvements to the company's production system. Filing 32-2, Brandl Decl., at ¶ 4. Before being shifted to the Fuel Management Group in 2007, Brandl had also worked for U.P. as a "Manager of Standard Practices." Filing 32-2, Brandl Decl., at ¶ 5.

As a manager of standard practices, Brandl analyzed and developed train dispatching methodologies to address various issues that impact dispatching, such as weather-related outages on the rail system. Filing 32-2, Brandl Decl., at ¶ 5. In a deposition, Brandl described this position, stating that "[t]he big push was to attempt to capture the knowledge . . . in the company and document methodologies on how things are . . . accomplished." Filing 40-1, Ex. B1, Deposition of Roger Brandl ("Brandl Dep."), at 4. At that time, U.P. was preparing "for the baby boomer retirement," so U.P. created Brandl's position "in order to try and capture the knowledge of all these old heads that were gearing up for retirement." Filing 40-1, Brandl Dep., at 4–5. In 2007, U.P. eliminated this position and transferred Brandl to the Fuel Management Group. Filing 32-2, Brandl Decl., at ¶ 6.

The new system developed by Brandl featured many improvements. It was more accurate, automated many of the data-entry functions of the old system, provided real-time capture of the horsepower hours, and could be used to create various reports. Filing 32-2, Brandl Decl., at ¶ 12. The new system allowed the user to manage and analyze the horsepower hours, rather than simply track them. Filing 32-2, Brandl Decl., at ¶ 13. Under the new system, the time needed to make manual corrections to the data dropped from approximately 6 hours per day to 3 hours per day, which would allow the horsepower hours manager to spend the majority of his or her time

- 4 -

analyzing the data and developing plans to increase efficiency and revenue. Filing 32-2, Brandl Decl., at ¶ 14.

### 4.     U.P. Begins a Reduction in Force

In or around early 2009, U.P.'s business dropped dramatically due to the economic downturn, and U.P. determined that it had to reduce costs throughout the company. Filing 32-2, Ex. A6, Declaration of Jeff Raffety ("Raffety Decl."), at ¶ 3. To avoid terminating employees, U.P. implemented a "workforce consolidation and department reorganization plan" (the "Workforce Plan"). Filing 32-2, Raffety Decl., at ¶ 4. Under the Workforce Plan, employees whose positions were eliminated were offered the following choice: they could return to a position within the company in which they had previous experience, or they could accept transfer to the "temporary placement pool." Filing 32-2, Raffety Decl., at ¶ 4. If placed in the temporary placement pool, the employee would be given temporary assignments or perform vacation relief while searching for other positions within U.P. Filing 32-2, Raffety Decl., at ¶ 5. Employees in the pool would retain the same title, pay, and benefits as under their previous position. Filing 32-2, Raffety Decl., at ¶ 6; filing 32-2, Ex. A7, Declaration of Steven Abolofia ("Abolofia Decl."), at ¶ 3. Any employee who chose instead to return to a previous position would (generally) be able to maintain their current salary and benefits for 2 years. Filing 32-2, Abolofia Decl., at ¶ 4; filing 32-3, Ex. A13, Temp. Pool FAQ, at 18.

As part of its Workforce Plan, U.P. eliminated various locomotive manager positions throughout the company. Filing 32-2, Raffety Decl., at ¶ 7. In or around February 2009, U.P. executive Jeff Raffety notified Benesh that, as part of the Workforce Plan, Benesh had to eliminate one of the four locomotive manager positions in the Fuel Management Group. Filing 32-2, Raffety Decl., at ¶ 9. At that time, Brandl had not yet implemented the new horsepower system. Filing 32-2, Benesh Decl., at ¶ 28.

At that time, the four locomotive manager positions in the Fuel Management Group were held by Hendrix (then age 56); Dwight Anderson (then 57); Joseph O'Lone (then 53); and Brandl (then 36). Filing 32-2, Benesh Decl., at ¶ 23. Hendrix, Anderson, and O'Lone consistently received performance ratings of "3.0 – Good Performer." Filing 32-2, Benesh Decl., at ¶ 25; Filing 32-2, Hendrix Evals., at 9, 14; filing 32-2, Ex. A8, Anderson Eval., at 25; filing 32-2, Ex. A9, O'Lone Eval., at 28. In contrast, Brandl received a better rating of "2.0 – Exceeds Expectations" in both his 2008 and 2009 performance evaluations at the Fuel Management Group. Filing 32-3, Ex. A11, Brandl Performance Evaluations ("Brandl Eval."), at 9, 15. The positions of Anderson and O'Lone were "interchangeable" with one another:

- 5 -

either could have performed the other's job. Filing 34-2, Deposition of Ed Benesh ("Benesh Dep."), at 2. However, their positions were not interchangeable with Hendrix's; they could not perform his job without training. Filing 34-2, Benesh Dep., at 3.

### 5. Hendrix's Position Eliminated

In April 2009, Benesh chose to eliminate Hendrix's position in the Fuel Management Group. Filing 32-2, Benesh Decl., at ¶ 31. In his sworn declaration, Benesh stated that, based upon his knowledge of his four locomotive managers' performance, he determined that Hendrix was the lowest performer and his position should be eliminated. Filing 32-2, Benesh Decl., at ¶ 29. Benesh stated that he made his decision based solely on performance. Filing 32-2, Benesh Decl., at ¶ 24.

Benesh believed that Brandl had stronger communication and analytical skills than Hendrix, which Benesh believed would make Brandl a more effective manager of horsepower hours than Hendrix. Filing 32-2, Benesh Decl., at ¶ 27. Benesh's evaluation of Brandl for 2009 praised Brandl's hard work in getting the new system running, stating that he "deserves credit for his leadership role in the design and implementation of the new system." Filing 32-3, Brandl Eval., at 13–14. The evaluation also indicated that Brandl would continue to improve the new system. Filing 32-3, Brandl Eval., at 13–14. He also stated, "[Brandl] works extra hours and strives for a quality product." Filing 32-3, Brandl Eval., at 14. Benesh also took into consideration that Hendrix had previous experience as a dispatcher, and figured that because Hendrix was a "hard worker" and had done a "good job" for him, he would have a chance to become a dispatcher again rather than be terminated. Filing 40-1, Ex. B2, Benesh Dep., at 13–15.

On April 27, 2009, Benesh and Raffety met with Hendrix to discuss the decision to eliminate his position. Filing 32-2, Benesh Decl., at ¶ 31. Around the same time, they gave Hendrix a letter and FAQ informing him of the terms governing the temporary placement pool. Filing 32-2, Benesh Decl., at ¶¶ 31-33; filing 32-3, Ex. A12, Letter from Benesh to Hendrix dated April 27, 2009 ("Temp. Pool Letter"), at 16; filing 32-3, Temp. Pool FAQ, at 17–19. The letter and FAQ explained the terms of the temporary placement pool as described above. Filing 32-3, Temp. Pool Letter, at 16; Temp. Pool FAQ, at 17–19. Per the letter, Hendrix's salary and benefits would remain the same while in the pool. Filing 32-3, Temp. Pool Letter, at 16. The FAQ clarified that it was unknown how long the pool would last and that there was no guarantee of continued employment, and stressed that it was in employees' best interest to obtain a regular assignment as soon as possible. Filing 32-3, Temp. Pool FAQ, at 17–18.

The letter and FAQ stated that, while in the pool, in order to maintain his employment with U.P., Hendrix was required to: report as scheduled and perform temporary assignments to the best of his ability; maintain "good performance"; actively seek reassignment to available positions throughout U.P.; and accept any position offered. Filing 32-3, Temp. Pool Letter, at 16; filing 32-3, Temp. Pool FAQ, at 17. Both further explained that, if offered a position, barring unusual circumstances, Hendrix was required to accept the assignment or he would be terminated. Filing 32-3, Temp. Pool Letter, at 16; filing 32-3, Temp. Pool FAQ, at 17.

The parties dispute what Hendrix was told at the meeting with Benesh and Raffety. U.P. contends that Raffety explained to Hendrix that his position was being eliminated and that he could *either* return to his previous position as a train dispatcher *or* be placed in the temporary placement pool. Filing 32-2, Raffety Decl., at ¶ 13; filing 32-2, Benesh Decl., at ¶ 32. Hendrix remembers the conversation differently. In his deposition, Hendrix stated that when called to the meeting, he was *already* in the placement pool. Filing 32-1, Hendrix Dep., at 40. This understanding is reinforced by the letter Hendrix received, which begins: "Confirming our recent discussion, this is to advise that due to workforce consolidation . . . you are being reassigned to a pending placement pool effective (TBD)." Filing 32-3, Temp. Pool Letter, at 16. Hendrix therefore believed that, per the terms of the placement pool, if he did not accept the train dispatcher position, he would be fired. Filing 32-1, Hendrix Dep., at 40–41. Hendrix considered the offer overnight, decided to accept the train dispatcher position, and the next day reported to the train dispatcher manager. Filing 32-1, Hendrix Dep., at 41–42.

When Hendrix's position in the Fuel Management Group was eliminated in late April 2009, Brandl had not yet finished implementing the new horsepower hours system. Filing 32-2, Brandl Decl., at ¶ 15. This was not the original plan. U.P. originally intended to have the new system up and running in about a year, which would have placed completion around early 2009. Filing 40-1, Ex. B2, Benesh Dep., at 12. However, when Brandl first began designing the new system, U.P. "did not have a very good idea of how long it would take." Filing 40-1, Benesh Dep., at 12. Brandl was told he would have funding for 1 year and that he would then move to another position. Filing 34-1, Brandl Dep., at 7–9. At some point, Brandl was told that the new position would be as a locomotive manager on the "Iowa desk." Filing 34-1, Brandl Dep., at 14. The new system was ultimately rolled out in July 2009, about half a year later than originally expected. Filing 34-1, Brandl Dep., at 9; filing 40-1, Benesh Dep., at 12.

When Benesh eliminated Hendrix's position, Brandl continued to develop and implement the new system and took over Hendrix's duties. Filing

32-2, Brandl Decl., at ¶ 15. The parties agree that this was also not part of the original plan. Everyone involved had assumed that after Brandl finished implementing the new system, he would train Hendrix on it, and then Hendrix would take over and Brandl would transfer to another position. Filing 34-2, Benesh Dep., at 4, 8, 11–12, 19; filing 34-1, Brandl Dep., at 10. Brandl, Benesh, and Hendrix all agreed that Hendrix would have been capable of running the new system after being trained by Brandl. Filing 34-2, Benesh Dep., at 15; filing 34-1, Brandl Dep., at 17; filing 32-1, Hendrix Dep., at 56.

After Brandl took over for Hendrix, three U.P. employees were transferred temporarily to the Fuel Management Group to assist in settling horsepower hours accounts that had piled up since 2007. Filing 40-1, Brandl Dep., at 8–9; filing 40-1, Benesh Dep., at 16–17. This backlog was not due to any neglect on Hendrix's or Brandl's part; it stemmed from when another railroad implemented a new system. Filing 40-1, Brandl Dep., at 8–9.

## 6.     Hendrix's Transfer and Termination

The Workforce Plan was designed to cushion the impact of transfers on U.P. employees. Under the Workforce Plan, Hendrix would have received the same pay and benefits in the train dispatcher position as he received as a locomotive manager. Filing 32-2, Abolofia Decl., at ¶ 4; filing 32-3, Temp. Pool FAQ, at 18. Additionally, Hendrix was exempted from serving on the "Extra Board." Filing 32-1, Hendrix Dep., at 45–47. Normally, once an employee successfully completed the train dispatcher training, he or she would be required to work on the "Extra Board," which required the employee to be ready and able to fill in for any dispatcher who was absent from any shift. Filing 32-1, at 45–47. However, Hendrix was informed that he would not have to serve on the Extra Board, but would be permitted to bid on a permanent position immediately after he completed training. Filing 32-1, at 45–47. Hendrix agreed that a permanent position was more desirable than being on the Extra Board. Filing 32-1, at 45–47.

As in the past, when Hendrix applied for the train dispatcher position, he was required to complete the training class. Filing 32-1, at 43. Hendrix was aware that his employment with U.P. would be terminated if he did not pass the class. Filing 32-1, at 52–53. Hendrix agreed that the class was necessary for safety reasons (filing 32-1, at 43), and understood the requirements for passing the class, as he had done so twice before. Filing 32-1, at 48. Hendrix needed to achieve a passing score on a track warrant examination. Filing 32-1, at 49–50. During the training class, Hendrix failed this exam and, as a result, failed to complete the class. Filing 32-1, at 49–50; filing 32-3, Ex. A14, Exam Results, at 20–26. Hendrix does not dispute that

- 8 -

he failed to complete the class, nor does he claim that he failed as the result of any impropriety or discrimination on U.P.'s part. Filing 32-1, at 50–51, 54. Because Hendrix failed the class, his employment with U.P. was terminated. Filing 32-1, at 51–54.

After his termination, Hendrix filed a charge of discrimination with the Nebraska Equal Opportunity Commission ("NEOC"), and on July 16, 2010, the NEOC issued a determination finding no reasonable cause to believe that U.P. discriminated against Hendrix on the basis of age. Filing 32-3, Ex. A15, at 27–28.

In addition to Hendrix's position, U.P. eliminated ten other locomotive manager positions throughout the company as part of the Workforce Plan. Filing 32-2, Raffety Decl., at ¶ 16. U.P. has provided a chart listing the ages and years of service of each of these locomotive managers, as well as the date they started in that position. Filing 32-2, Raffety Decl., at ¶ 17. The ages of the persons whose positions were eliminated were: 28, 29, 37, 46, 47, 49, 53, 57, 57, and 61. Filing 32-2, Raffety Decl., at ¶ 17.

## DISCUSSION

The ADEA prohibits employers from discriminating against employees age 40 and over, on the basis of their age. 29 U.S.C. §§ 623(a)(1) and 631(a). If, as in this case, the plaintiff does not present "direct" evidence of discrimination,[1] the case is considered under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Rahlf v. Mo-Tech Corp., Inc.,* 642 F.3d 633, 637 (8th Cir. 2011). Both parties agree that this case should be analyzed under this framework. Filing 31, at 12–13; filing 35, at 17–19.

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of age discrimination. *Rahlf,* 642 F.3d at 637. The prima facie case establishes a presumption that, in the absence of explanation, requires the conclusion that the employer acted in a discriminatory manner. *Ward v. Int'l Paper Co.,* 509 F.3d 457, 461 (8th Cir. 2007). Therefore, it must present evidence sufficient to create an inference that an employment decision was based on age. *Id.*

---

[1] "Direct" evidence in this context refers not to "the converse of circumstantial evidence." *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir. 2004). Rather, it is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Id.* Whether evidence is direct in this context "refers to the causal strength of the proof." *Id.*

- 9 -

The parties agree that this case should be analyzed as part of a reduction-in-force (RIF). *See* filing 31, at 13–14; filing 35, at 18–19.² To make a prima facie showing in a RIF case, the plaintiff must show that (1) he was over 40 years old, (2) he met the applicable job qualifications, (3) he suffered an adverse employment action, and (4) there is some "additional evidence" that age was a factor in the employer's termination decision. *Rahlf*, 642 F.3d at 637. In a non-RIF case, the plaintiff can sometimes get by with showing that he or she was replaced by a substantially younger worker. *Ward*, 509 F.3d at 461. By contrast, in a RIF case, "some additional evidence" of discrimination is necessary, because the plaintiff's job has been eliminated and/or redistributed to other workers. *Id.* The mere fact that "a younger employee assumed some of plaintiff's duties does not establish a prima facie case because often at least one younger worker receives some of plaintiff's duties." *Id.*

If the plaintiff establishes a prima facie case of age discrimination, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its adverse employment action. *Rahlf*, 642 F.3d at 637. If the employer makes this showing, the burden returns to the plaintiff, who must offer evidence that creates a fact issue as to whether (1) the employer's proffered reason was a pretext for discrimination; *and* (2) creates a reasonable inference that age was a determinative factor in the adverse employment decision. *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011). In some cases, a strong factual showing that the employer's proffered reason is "'unworthy of credence'" may, when combined with a strong prima facie case, be sufficient to create an inference of age discrimination. *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 147–48 (2000)).

It is important to keep in mind that, at all times, the plaintiff retains the burden of persuasion to prove that age was the "'but-for'" cause of the adverse employment action. *Rahlf*, 642 F.3d at 637 (quoting *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009)). The plaintiff must show that the employer's stated reason was false *and* that age discrimination was the real reason. *Tusing*, 639 F.3d at 516.

---

² This is also borne out by the evidence. In Benesh's performance evaluation of Brandl from January 2010, completed after Hendrix's position was eliminated, Benesh notes that Brandl was performing the job of *two* locomotive managers: handling the day-to-day tasks of the horsepower hour manager and continuing to design, update, and implement the new system. Filing 32-3, Brandl Eval., at 12.

- 10 -

**1.     Hendrix's Prima Facie Case**

The parties do not dispute that Hendrix has satisfied two of the four elements of his prima facie case: he was over 40 years old when his position was eliminated, and he was qualified for his position as the locomotive manager in charge of the horsepower hours desk. The Court further finds that Hendrix has presented sufficient evidence of an adverse employment action. However, Hendrix has failed to present "some additional evidence" that age was a factor in U.P.'s decision to eliminate his position. *See Ward, 509 F.3d at 461*.

**A.     Adverse Employment Action**

To show an adverse employment action, Hendrix must show that he suffered a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005). Viewing the evidence in the light most favorable to Hendrix, he has presented evidence sufficient to generate a fact question on whether he experienced an adverse employment action.

The parties dispute whether Hendrix was "forced" into the position of train dispatcher, or whether he could have chosen to stay in the temporary placement pool. Hendrix contends that when he met with Benesh and Raffety, he was already in the placement pool and therefore obligated to take any position offered. Ultimately, it does not matter whether Hendrix was correct in this understanding. Even if the only change in Hendrix's position was from locomotive manager to train dispatcher, he experienced a material employment disadvantage.

Moving from the single locomotive manager in charge of horsepower hours to just one of many train dispatchers carried with it a significant loss of responsibilities. As locomotive manager, Hendrix was responsible for tracking locomotive use throughout the entire railway network. As a train dispatcher, he was interchangeable with other train dispatchers and only responsible for a limited geographic area. Hendrix went from a position which by its title involved "management," to that of a train dispatcher, which was not considered a management position. Filing 32-1, Hendrix Dep., at 11.

This transfer also increased the risk that Hendrix would be terminated. There is no evidence that Hendrix would have to pass any exams to maintain his position as locomotive manager; in contrast, as a train dispatcher, Hendrix could be fired for not achieving a passing score on even a single track warrant examination.

Defendant argues that there was no adverse employment action because Hendrix would remain a Band C employee and continue to receive the same pay and benefits. Filing 31, at 14. This ignores the above

disadvantages that Hendrix faced. Also, while Hendrix would initially retain his same salary and benefits, after 2 years he faced the prospect of reductions in both.

Additionally, if Hendrix *was* in the temporary placement pool when he met with Benesh and Raffety, he was already subject to material disadvantages. First and foremost, he was under an obligation to take *any* job offered, or lose his employment. Second, as a member of the temporary pool, he would no longer have a regular position but would have to work on various projects as needed. This would be a significant and detrimental change from the regular position he was accustomed to. He would also have been expected to actively use his time and energy searching for a new position.

## B. Additional Evidence of Age Discrimination

To satisfy the fourth element of his prima facie case, Hendrix must present some "additional evidence" that age was a factor in the decision to eliminate his position. It bears noting that Hendrix must show that age was a factor in the initial decision to eliminate his position as locomotive manager. The fact that he was ultimately terminated, after his position was eliminated, has no bearing on the issue of age discrimination. Hendrix does not dispute that the position of train dispatcher was "safety sensitive;" that re-training was necessary for safety purposes; that the requirement to pass all track warrant exams was necessary and reasonable; that his exam was fairly administered and graded; that he was fired as a result of failing the exam; and that these requirements were age-neutral.

Hendrix may meet the burden of providing additional evidence by offering "statistical" evidence, or by presenting "circumstantial" evidence, i.e., comments and practices suggesting a preference for younger employees. *Rahlf*, 642 F.3d at 637. Hendrix has not offered any statistical evidence purporting to show age discrimination, but relies upon several pieces of circumstantial evidence.

Hendrix focuses on Brandl's previous position, where Brandl was tasked with "'captur[ing] the knowledge of all these old heads that were gearing up for retirement.'" Filing 35, at 22; filing 40-1, at 5. Hendrix argues that Brandl "was in the position to do that again," and that Hendrix was demoted because of his age and nearness to retirement.[3] It is not clear what

---

[3] Hendrix does not appear to be arguing that, if U.P. eliminated his position in order to avoid paying his retirement benefits, this would constitute age discrimination. In any event, such an argument would be foreclosed by *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611–13 (1993). Nor has Hendrix presented any evidence that this was the reason (or even *a* reason) that U.P. eliminated his position.

Hendrix means when he states that Brandl "was in the position to do that again." Filing 35, at 22. There is no evidence that Brandl's prior work led to older workers being demoted or fired. By the terms of Brandl's statement, these workers were nearing *retirement*, i.e., they were going to be leaving the company voluntarily.

Later in his brief, Hendrix argues that this comment shows that U.P. was "concerned [about] having too many older workers" and that U.P. seized an opportunity to replace Hendrix with a younger worker. Filing 35, at 26. This argument is also without merit.

First, Brandl's comment was a mere "stray remark." *Carraher v. Target Corp.*, 503 F.3d 714, 718 (8th Cir. 2007). Brandl was not involved in the decision to terminate Hendrix's position. A remark by him cannot show evidence of age discrimination on U.P.'s part without evidence of "'*some* causal relationship'" between his remarks and the relevant decisionmakers responsible for eliminating Hendrix's position. *Id*. (quoting *Wittenburg v. American Express Fin. Advisors, Inc.*, 464 F.3d 831, 837 (8th Cir. 2006)). Hendrix has not offered evidence of a causal relationship between this comment and the elimination of his position. Brandl's comment was made in a deposition, well *after* the decision to eliminate Hendrix's position, and referred to Brandl's work in another department more than a year prior to the elimination of Hendrix's position. To the extent that Brandl's comment refers to a directive issued by U.P., it refers only to some vague and unspecified higher-ups at U.P. There is nothing linking these persons to those responsible for initiating the Workforce Plan, let alone to the decision to eliminate Hendrix's position.

Second, even if Brandl's comments could be connected to the relevant decisionmaker, U.P.'s desire to "capture the knowledge" of older workers does not show any discriminatory animus toward older workers. If anything, these comments show that U.P. valued older workers for their experience and knowledge, and was attempting to prepare for their eventual retirement. Preparing for employees' retirement is not evidence of age discrimination. In *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001), the court held that a company's "concern with keeping older employees up to speed [with new technology] hardly warrants an inference of discriminatory animus." The inference is even more attenuated here, where U.P. was not seeking to teach older employees, but to *learn from* them.

Hendrix has not offered any other evidence that age was a factor in the decision to eliminate his position.[4] Because Hendrix has failed to set forth a prima facie case of age discrimination, U.P. is entitled to summary judgment.

**2.     U.P.'s Proffered Reason for Demoting Hendrix**

Moreover, even if Hendrix had offered some evidence that age was a factor in U.P.'s decision, he has failed to show that U.P.'s proffered reason was pretextual. The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence. *Floyd v. Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999). U.P. claims that Hendrix's demotion was part of its overall reduction-in-force. Hendrix does not dispute that the overall reduction-in-force was genuine; nor does he argue that, other than as regards his position, it was a pretext for discrimination.[5] Hendrix admitted in his deposition that there had been downsizing and workforce consolidation going on for years at U.P., stating, " . . . ever since I've been there . . . . the company's always been downsizing." Filing 32-1, at 42.

U.P. has also articulated a nondiscriminatory justification for eliminating Hendrix's position in particular: Brandl was more qualified than Hendrix for the position. Hendrix does not contest the evidence of Brandl's qualifications, nor does he dispute the fairness or accuracy of the evaluations completed by Benesh. The undisputed evidence shows that Benesh fairly evaluated both Hendrix and Brandl, and rated Brandl's performance higher.

---

[4] Hendrix admitted that, other than his termination, he did not experience or witness any age discrimination in his various positions at U.P. Filing 32-1, Hendrix Dep., at 11, 14, 24–25, 26, 36.

[5] The Court notes that RIF plans generally include objective criteria by which to determine which jobs will be eliminated and often include objective evidence of a business decline. *Gaworski v. ITT Commercial Fin. Corp.*, 17 F.3d 1104, 1109 (8th Cir. 1994). However, when a company exercises its business judgment in deciding to reduce its work force, it need not provide evidence of financial distress to make it a legitimate RIF. *Rahlf*, 642 F.3d at 639. In any event, Hendrix does not dispute that U.P.'s overall RIF was genuine.

Nor does Hendrix dispute the veracity of the data offered by U.P. regarding the ages of other locomotive managers fired as part of the reduction in force. However, the Court notes that U.P.'s data are of little use, because such evidence "is meaningless without some analysis of the age of the *entire workforce* . . . before and after the reduction in force." *Chambers v. Metro. Prop. and Cas. Ins. Co.*, 351 F.3d 848, 856 (8th Cir. 2003) (emphasis supplied).

Hendrix admitted in his deposition that Brandl was better at using the new system. Filing 32-1, Hendrix Dep., at 31.

Hendrix denied that Brandl was better at managing horsepower hours or working with people. Filing 32-1, at 31. But even accepting this as true, the fact that U.P. placed greater value on Brandl's skills with the new system is not evidence of age discrimination. Rather, it is precisely the sort of business judgment that courts will not review. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 781 (8th Cir. 1995) ("[E]mployment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") U.P. has met its burden of articulating a legitimate, nondiscriminatory justification for eliminating Hendrix's position.[6]

### 3.    Hendrix's Response

Assuming that Hendrix had made a prima facie case, he would next need to present evidence that creates a question of material fact as to whether U.P.'s proffered reason is pretextual and that creates a reasonable inference that age was a determinative factor in the decision to discharge him. *Rahlf,* 642 F.3d at 637. As with making a prima facie case, Hendrix may use either statistical or circumstantial evidence. *Id.* Pretext may also be shown by evidence that the employer's reason for the termination has changed substantially over time. *Loeb v. Best Buy Co., Inc.,* 537 F.3d 867, 873 (8th Cir. 2008). As discussed above, Hendrix has not offered any viable evidence that age was a factor in the decision to eliminate his position. For the reasons discussed below, the Court also finds that he has failed to offer evidence that supports a finding of pretext.

Hendrix first argues that Brandl's "old heads" comment supports a finding of pretext. This evidence no more shows pretext than it showed age discrimination.

Next, Hendrix points out that (1) Brandl was originally supposed to have a temporary position and move on after designing the system; and (2)

---

[6] Both Hendrix and Brandl were previously disciplined for misconduct at U.P, which arguably touches on their qualifications for the position at the horsepower hours desk. *See,* filing 31, at ¶¶ 13–14; filing 35, at ¶¶ 13–14a; filing 39, at 2. Both parties, however, dispute the relevance of these incidents of misconduct. *See,* filing 35, at ¶¶ 13 and 14; filing 39, at 2. At most, the evidence shows that both Hendrix and Brandl had previously received sanctions for misconduct. This does not affect the strength of their qualifications *relative* to one another. Therefore, neither submission affects the Court's decision and neither will be discussed further.

Brandl had the system up and running just a few months following Hendrix's demotion. Hendrix argues that U.P. could have simply stuck with the plan, so there was no real, "urgent" need to demote Hendrix, rather than simply waiting for Brandl to transfer to another department. (Filing 35, at 25.)

There are some holes in this argument. First, the "original plan," whereby Brandl would develop the new system in a temporary position, and then move on, was itself formulated *before* the Workforce Plan took effect. Circumstances changed, and plans were adjusted, but that does not show evidence of pretext or age discrimination. Hendrix does not dispute that U.P. had a legitimate need to reduce its workforce, nor that U.P. had a legitimate need to eliminate several locomotive manager positions.

Hendrix appears to be arguing that because there was no "urgency" and Brandl could be transferred, U.P. did not need to eliminate Hendrix's position, because after Brandl left, the Fuel Management Group would be back down to three locomotive managers. This misses the point of a reduction-in-force. Before the Workforce Plan took effect, Hendrix's department had three "regular" locomotive managers. In late 2007, Brandl joined as a "temporary" member of the Fuel Management Group. But it was always intended that Brandl would remain on as a locomotive manager, simply that he would move to another area. In other words, U.P. would have had locomotive manager positions for all four of the relevant employees: Hendrix, O'Lone, Anderson, and Brandl.

After the Workforce Plan took effect and Hendrix was eliminated, the Fuel Management Group had three regular locomotive managers and no "temporary" ones. Nor did U.P. need to find another locomotive manger position within the company for Brandl. If U.P. had not eliminated Hendrix's position, there would still be an "extra" locomotive manager position, simply in another department. Because Hendrix does not offer any evidence to dispute the legitimacy of the overall reduction-in-force, Hendrix's argument that there was no "urgent" need to eliminate his position is based on nothing but his speculation.

Hendrix attempts to bolster his argument by pointing out that Brandl "had the assistance of three individuals full time for approximately the equivalent of five months following Plaintiff's demotion." Filing 35, at 25. The evidence shows that these employees were there only to assist Brandl with handling a backlog of horsepower hours accounts that had been accumulating since 2007. This only demonstrates that Brandl, who supervised these temporary employees, was doing even more work than Hendrix; not that he was doing less work or was somehow less qualified. *See* filing 32-3, Brandl Eval., at 12 (praising Brandl for managing a temporary assistant and settling the old accounts).

Finally, Hendrix makes the following argument:

> [U.P.] asserts that it . . . considered that the Plaintiff could move to other positions within the company in making the decision. This is true about Brandl as well, Brandl even had a position that he was prepared to move into. This only supports an inference of pretext . . . .

Filing 35, at 26 (citation omitted). Hendrix has not explained *how* this supports an inference of pretext. The evidence shows that U.P. legitimately determined Brandl was more qualified for the position and chose to demote Hendrix.

In sum, even if Hendrix had presented evidence sufficient to support his prima facie case, he failed to present evidence sufficient to show an issue of material fact with respect to whether U.P.'s justification for demoting him was a pretext for unlawful discrimination.

## CONCLUSION

The Court finds that defendant U.P. is entitled to summary judgment. Hendrix has failed to present evidence of age discrimination or pretext. Even viewing the evidence in the light most favorable to Hendrix, no reasonable jury could find that U.P. impermissibly used his age as a factor in the decision to eliminate his position. Accordingly,

IT IS ORDERED that:

1. Defendant Union Pacific Railroad Company's Motion for Summary Judgment (filing 30) is granted; and

2. A separate Judgment will be entered.

Dated this 27th day of April, 2012.

BY THE COURT:

John M. Gerrard
United States District Judge